**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
UNITED STATES OF AMERICA,          :
                                   :
            Plaintiff,             :
                                   :           97 Civ. 1153 (JFK)
      -against-                    :           **OPINION AND ORDER**
                                   :
RICHARD SAGE,                      :
                                   :
            Defendant.             :
------------------------------X

<u>APPEARANCES</u>:

    For Plaintiff United States of America:

        David N. Kelley
        United States Attorney
        Southern District of New York
        One Saint Andrews Plaza
        New York, NY 10007
        Of Counsel: AUSA Lisa R. Zornberg

    For Defendant Richard Sage:

        David P. Wadyka
        DiFrancesco, Bateman and Coley, PC
        15 Mountain Boulevard
        Warren, NJ 07059-5686

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN**, United States District Judge:

Plaintiff, the United States of America, moves for summary judgment against Defendant, Richard Sage ("Sage"), to reduce to judgment a trust fund penalty assessed against Defendant for the unpaid withholding tax obligations of Defendant's former corporation. For the reasons discussed below, Plaintiff's motion is granted.

## Background[1]

From February 1984 through January 1985, the tax period in question, Sage was the Chief Executive Officer ("CEO") of OTI, Inc. ("OTI"), a company headquartered in Farmington, New Mexico, and he held himself out as OTI's President on several occasions. In these positions, he had the ability to hire and fire employees, make decisions regarding what creditors to pay, and sign corporate checks. Sage was the sole shareholder of OTI's stock, all of which was pledged to two of OTI's equipment lessors, Kirlin Enterprises and Broadcasting Publications (the "Equipment Lessors") as security.

Georgie Monk, OTI's corporate secretary and office

---

[1] Because this is a motion for summary judgment, the facts summarized here either are undisputed or conform to the facts alleged by the Defendant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

manager, under Sage's supervision, made day-to-day decisions regarding accounts payable until late 1984. At this point, Sage hired Edward A. Montez as a consultant to assist with bookkeeping. Montez made recommendations to Sage as to which creditors should be paid, and Sage either approved or rejected these recommendations.

When Sage became the owner of OTI in February 1984, he discovered that OTI was already indebted to the IRS for approximately $100,000.00. Soon after, OTI began experiencing severe cash flow problems.

On or around October 31, 1984, OTI filed a tax return for the third quarter of 1984 showing unpaid withholding taxes due in the amount of $249,421.27. Between July 1984 and January 1985, OTI paid creditors other than the government. In January 1985, Sage was involuntarily removed from OTI by the Equipment Lessors.

A January 25, 1985 agreement memorialized the terms of Sage's removal. In the agreement, OTI pledged to pay any remaining debts owed to the IRS. About one month after Sage's removal, the Equipment Lessors alleged that Sage had violated the January 25, 1985 agreement, and as a result rescinded the contract. In 1986, Sage initiated legal proceedings against the Equipment Lessors in the United States District Court for the District of Columbia (the "DC Litigation"). The Court concluded that because Sage acted fraudulently, the Equipment Lessors had

3

legally rescinded the contract. (Pl.'s Ex. V at 8.)

The IRS also initiated an action against Montez and sued to reduce the penalty to judgment.[2] In 1992, following a jury trial, the United States Court for the Southern District of Texas entered judgment for Montez. (Pl.'s Ex. W.) Sage testified at Montez's trial that Montez was a consultant of OTI and not an employee and that Montez had to get permission from Sage regarding which creditors to pay. (Pl.'s Ex. C at 66-68.)

On January 12, 1986, the IRS assessed a one hundred percent penalty against Sage in the amount of $209,249.36. The instant action against Sage to reduce this amount to judgment was filed in 1997. The Court now considers the government's summary judgment motion.

## Discussion

I. Legal Standards

A. The Internal Revenue Code

The Internal Revenue Code (the "Code") requires employers to withhold federal income and social security taxes from employee paychecks and to hold this money "'in trust for the United States.'" Fiataruolo v. United States, 8 F.3d 930, 938 (2d Cir. 1993) (quoting 26 U.S.C. § 7501(a) (1988)). The money withheld must be paid to the Internal Revenue Service ("IRS") on a

---

[2] The IRS also initiated an action against the Equipment Lessors, but the action was never pursued.

4

quarterly basis. Id. (citing Slodov v. United States, 436 U.S. 238, 243 (1978)).  Under § 6672(a) of the Code, if the employer withholds wages from employees but fails to pay withholding taxes to the IRS, each individual in the employer company who was responsible for the failure to pay is personally liable. Id. ("[Section] 6672 is a vital collection tool that cuts through an employer's organizational structure and allows the IRS to impose liability directly and individually on those persons responsible for the tax delinquency.").  Section 6672(a) provides that

> [a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall . . . be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

To establish § 6672(a) liability, a two-part test must be satisfied.  First, the individual assessed must be a "responsible person." See United States v. Landau, 155 F.3d 93, 100 (2d Cir. 1998).  Second, the individual must have acted "willfully" in failing to pay the taxes. See id.

The burden of proof is on the person against whom the IRS assesses a tax penalty to disprove, by a preponderance of the evidence, each of these two elements. Winter v. United States, 196 F.3d 339 (2d Cir. 1999) (citing Fiataruolo, 8 F.3d at 938).

5

1. <u>Responsible Person</u>

Courts take a broad view regarding who qualifies as a responsible person. <u>United States v. Rem</u>, 38 F.3d 634, 642 (2d Cir. 1994); <u>Fiataruolo</u>, 8 F.3d at 938. There are several factors courts consider in determining responsibility, including (1) the individual's status as outlined by corporate bylaws; (2) his control of the corporation's financial affairs; (3) "his ability to sign checks"; (4) his ownership of corporation stock; and (5) his ability to hire and fire employees. <u>Hochstein v. United States</u>, 900 F.2d 543, 547 (2d Cir. 1990), <u>cert</u> <u>denied</u>, 504 U.S. 985 (1992); <u>see</u> <u>also</u> <u>Fiataruolo</u>, 8 F.3d at 939 (holding that responsible-person status turns on the individual's "status, duty and authority").

When examining the five <u>Hochstein</u> factors, the central question is whether the person exercises "significant control" over the corporate finances. <u>Winter</u>, 196 F.3d at 345; <u>Rem</u>, 38 F.3d at 642; <u>Roberts v. United States</u>, No. 89 Civ. 8575, 1991 WL 338252, at *5 (S.D.N.Y. Apr. 10, 1991). In the Second Circuit, significant control does not "translate into a requirement of absolute authority." <u>Fiataruolo</u>, 8 F.3d at 939. One may be responsible under § 6672 even if he was not the most responsible person and did not have the greatest control over the day-to-day affairs of the corporation. <u>Roberts</u>, 1991 WL 338252, at *5. "'It is not necessary that an individual have the final word as to

6

which creditors should be paid" in order to be held responsible under this section, Hochstein v. United States, 900 F.2d 543, 547 (2d Cir. 1990), cert denied, 504 U.S. 985 (1992) (quoting Gephart v. United States, 818 F.2d 469, 475 (6th Cir. 1987)), and more than one person can have the significant control necessary to be held liable for a tax default. Fiataruolo, 8 F.3d at 939.

2. Willfully

Under § 6672, a responsible person acts willfully if he "(a) knew of the company's obligation to pay withholding taxes, and (b) knew that the company funds were being used for other purposes instead." United States v. Rem, 38 F.3d 634, 643 (2d Cir. 1994). Paying employee wages is like paying a creditor for the purposes of establishing willfulness under § 6672. See Hochstein, 900 F.2d at 548. In O'Callaghan v. United States, 943 F. Supp 320, 325 (S.D.N.Y. 1996), the Court explained that

> [w]ithholding taxes are to be held in trust for the government and may not be used to finance the company. The government cannot be forced to act as a business partner with a delinquent tax payer and bear the risk of nonpayment of trust funds.

Therefore, a considered decision not to pay the taxes owed, evidenced by payments to other creditors (including employees) with knowledge that withholding taxes are due establishes willfulness as a matter of law.

An individual cannot escape liability by delegating

7

payment of taxes and bills to others. See id. at 326.  A person also cannot avoid liability by claiming he did not find out about the delinquency until after the return was filed:  "[E]ven if a responsible person did not know contemporaneously of the company's nonpayment of withholding taxes, he or she will be held liable for any nonpayment if, when he or she became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes." Winter v. United States, 196 F.3d 339, 345-46 (2d Cir. 1999) (citing Rem, 38 F.3d at 643).

The Second Circuit recognizes a "reasonable cause" exception.  Winter, 196 F.3d at 345-46.  Under the exception, "a responsible person's failure to cause the withholding taxes to be paid is not willful if he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." Rem, 38 F.3d at 643 (citing Kalb v. United States, 505 F.2d 506, 511 (2d Cir. 1974)).

B.  Summary Judgment

A motion for summary judgment may be granted under Rule 56 of the Federal Rules of Civil Procedure if the entire record demonstrates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  When viewing the evidence, the Court must "assess the

record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990); see also Anderson, 477 U.S. at 255; McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). To survive the motion, the non-movant must present evidence of a genuine issue of fact that requires a trial. Anderson, 477 U.S. at 257.

A party cannot, however, "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir. 1996). Allowing a party to create an issue of fact through evidence that contradicts prior testimony "'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Id. (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969)).

In a § 6672 dispute, "summary judgment is appropriate where there are no genuine questions as to the assessed individual's control of company funds and decision-making authority, his or her knowledge of the deflection of company funds to payees other than the IRS, or the existence or reasonableness of his or her belief that the taxes were, in fact, being paid." Winter v. United States, 196 F.3d 339, 346 (2d Cir. 1999) (citing

9

United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994))

Willfulness, under § 6672, is usually a question of fact. Hochstein v. United States, 900 F.2d 543, 547 (2d Cir. 1990), cert denied, 504 U.S. 985 (1992). A court may grant summary judgment as to willfulness "only when the facts are undisputed and application of the law to those facts will reasonably support only one ultimate conclusion." Winter, 196 F.3d at 347 (citing Richardson v. New York State Dep't of Correctional Service, 180 F.3d 426, 437-38 (2d Cir. 1999)). If, on the other hand, "the individual's position makes his claim of ignorance of nonpayment plausible and there are no other indicia of knowledge," a question of fact exists as to willfulness. Rem, 38 F.3d at 644.

II. Analysis

A. Liability

1. Sage Is a Responsible Person

All Hochstein factors are present in this case to Sage's detriment. Sage was the CEO and sole shareholder at all relevant times and sometimes held himself out as the company's President. He had the power to hire and fire employees and utilized this power by, for example, hiring Montez, and in 1984, firing then-President Jack Cave. (Pl.'s Ex. C at 81-82.) Sage had corporate check-signing authority, signed signature cards for OTI's checking accounts, and in general controlled the corporation's financial affairs.

On similar facts, courts have held individuals liable as a matter of law. See e.g., United States v. Landau, 155 F.3d 93, 100 (2d Cir. 1998) (finding as a matter of law that President, CEO, and sole shareholder was responsible person); Barnett v. I.R.S., 988 F.2d 1449, 1455 (5th Cir. 1993) (finding no material issue of fact where individual was director, officer, twenty-percent shareholder, had power to hire and fire, and had check-signing authority);[3] Kalb v. United States, 505 F.2d 506, 511 (2d Cir. 1974) (finding as a matter of law that both CEO and major stockholder with check-signing authority who signed some of the company's tax returns were responsible persons).

Cases where courts in this circuit have denied summary judgment are clearly distinguishable. See e.g., Fiataruolo v. United States, 8 F.3d 930, 939-40 (2d Cir. 1993) (finding material issue of fact where individuals were not officers or employees, were not shareholders, did not have authority to hire and fire, and whose check-signing authority was minimal); United States v. Rem, 38 F.3d 634, 644-45 (2d Cir. 1994) (finding material issue of fact where evidence suggested that individual's title was merely titular, his check-signing authority was negligible, and all business decisions were controlled by his mother).

---

[3] Though this case is from the Fifth Circuit, the court considered factors almost identical to the Hochstein factors considered by the Second Circuit. See Barnett, 988 F.2d at 1455.

11

Sage argues that despite the presence of the Hochstein factors, he did not in actuality have significant control over OTI's finances for two reasons. First, Sage argues that the Equipment Lessors to whom his stock was pledged had the final word when it came to paying creditors. In this circuit, the fact that someone else has the final word does not defeat responsibility under § 6672. See Fiataruolo, 8 F.3d at 939; Hochstein, 900 F.2d at 547. Even more compelling, in prior testimony, Sage admits that the Equipment Lessors were not involved in OTI's operations (Pl.'s Ex. D at 101), and that Sage felt no obligation to notify the Equipment Lessors when he assigned OTI's assets (Pl.'s Ex. B at 334-35). Sage also testified: "I never went back and had a formal meeting because I was the only shareholder and there was nobody to have a meeting with, I never changed it. . . . I was, in fact, the owner of the company . . . ." (Pl.'s Ex. C at 81.) Sage cannot create a material issue of fact by contradicting prior testimony. See Hayes v. New York City Dept. Of Corrections, 84 F.3d 614, 619 (2d Cir. 1996).

Second, Sage argues he did not have significant control because many of the decisions in question were made by employees and that Sage was not always in touch with the day-to-day operations of the company due to travel. The fact that Sage shared responsibility for paying creditors with subordinates or that he was not in the office every day does not cut against his

responsibility under § 6672. See Fiataruolo, 8 F.3d at 939; Roberts v. United States, No. 89 Civ. 8575, 1991 WL 338252, at *5 (S.D.N.Y. Apr. 10, 1991). Furthermore, Sage admitted at Montez's trial that Sage made the ultimate decisions regarding how creditors should be paid:

> Q. Was Ed [Montez] making decisions about who OTI would pay with the money he had?
> A. As I said a minute ago, he would come to me and he would say, I think we should do this. . . . But those were the recommendations that he would make and then usually I would go along with it.

(Pl.'s Ex. C at 66-68.) Again, Sage cannot create an issue of material fact by contradicting prior testimony. See Hayes, 84 F.3d at 619.

Similarly, with regard to Monk, Sage admits in deposition testimony that Monk came to him for advice when she had questions about paying bills (Pl.'s Ex. D at 84), that Monk reported to him (Pl.'s Ex. D at 136), that Monk kept Sage apprised of the taxes due to the IRS (Pl.'s Ex. B at 132-33), that Sage directed Monk to pay the taxes (Pl.'s Ex. D at 134, 158-59), and that Sage could have fired Monk for failing to pay the taxes (Pl.'s Ex. D at 158).

There are no material questions as to Sage's control of company funds and decision-making authority. Sage is deemed a responsible person under § 6672.

2. Sage Acted Willfully

13

The government asserts in its Local Rule 56.1 Statement that "Sage was aware of the third quarter 1984 tax delinquency, both before and after OTI filed its third quarter tax return." (Pl.'s Local R. 56.1 Statement ¶ 9.) Sage denies the allegation as stated "in that Sage became aware of the third quarter of 1984 delinquency after the return had been filed." (Def.'s Local R. 56.1 Statement ¶ 9.) Sage's admission that he knew of the delinquency after it was filed is more than sufficient for § 6672 liability. See Winter v. United States, 196 F.3d 339, 345-46 (2d Cir. 1999).

After Sage learned of the 1984 third quarter delinquency, OTI paid creditors other than the IRS when it had liquid assets to cover the delinquency. OTI's bank records show approximately $4.3 million worth of deposits between July and November 1984, a sum Sage does not dispute. In testimony Sage admits to paying other creditors during this period:

> Q. Okay. After you found out about the payroll taxes being large, the extent of the payroll taxes for the third quarter and you said that was based on the tax return; is that right?
> A. Yes, I guess so. I mean we generally knew what it was. But after the official piece of paper was prepared, I said this is it. We said yes, that is a pretty large number . . . .
>
> . . . .
>
> Q. Okay. And you still tried to make the company go? I mean kept operations, thinking maybe we can get more money in?
> A. Yes.

```
Q.  So you paid other creditors at that time . . . ?
A.  Payroll.
Q.  And the phone bill?
A.  Yes.
Q.  Things to keep the doors open, right?
A.  Yes.
```

(Pl.'s Ex. C at 101.)

It is also undisputed that in August of 1984, OTI wrote two checks to a company called ITT totaling $43,167.60. (Pl.'s Ex. K; Pl.'s Ex. D at 86-92.) Sage admits that he knew of the payments to ITT, and that the payments were made because "Chuck Kilgore at ITT used to call me two and three times a month threatening to foreclose." (Pl.'s Ex. B at 357.)

Sage also authorized OTI's payment of a check to himself for $14,700 in October 1984. (Pl.'s Ex. D at 93-94; Pl.'s Ex. P.) In September and October 1984, OTI paid senior officer Jeff Davis $7,500. (Pl.'s Ex. D at 98-99; Ex. Q.) In November 1984, Sage authorized OTI's payment to Montez for $10,000. (Pl.'s Ex. B at 349-51.)

Sage admits that other creditors were paid at the time in question but argues against liability because he was making efforts to pay the IRS at the same time. (Def.'s Local R. 56.1 Statement ¶ 10.) These efforts are irrelevant. Sage was required to keep withholding taxes in a trust and as such should not have been using money withheld from employees as part of his operating expenses. The IRS should have been paid in full before other

debts were settled in order to avoid the risk of nonpayment of the trust funds. See O'Callaghan v. United States, 943 F. Supp 320, 325 (S.D.N.Y. 1996). As the Second Circuit reasoned in Kalb v. United States, 505 F.2d 506, 510 (2d Cir. 1974):

> [S]ection 7501(a) makes explicit, withholding taxes are held in trust. We cannot imagine that in any other context a trustee could avoid his obligations by entering into an agreement by which funds entrusted to him are used to pay his other obligations.

On the subject of OTI's attempts to satisfy the third quarter tax default, Sage assigned certain OTI receivables to the IRS. (Pl.'s Ex. D at 161-62.) Sage attempts to defeat summary judgment by claiming the IRS did not vigorously pursue these assets. The IRS, however, is not required to attempt collection against the corporation before assessing a penalty against a responsible person such as Sage. See Macguire v. United States, No. 77 Civ. 518, 1980 WL 1518, at *1 (W.D.N.Y Mar. 7, 1980) ("It is not even necessary for the government even to attempt to approach the corporation, its creditors, or its assets before pursuing its claim directly against responsible persons."); see also Bradley v. United States, 936 F.2d 707, 710 (2d Cir. 1991); Spivak v. United States, 370 F.2d 612, 615 (2d Cir.), cert. denied, 387 U.S. 908 (1967).

Sage also argues he has a "reasonable cause" for failing to pay the tax delinquency because of his 1985 agreement with the Equipment Lessors, in which they promise to pay the

default. The "reasonable cause" exception is inapplicable here. The exception, "of very limited application," relieves someone who reasonably believed taxes were being paid. Id. at 508. Sage makes no assertion that, at the time he was in control of the company, he reasonably believed the third quarter taxes were being paid. To the contrary, Sage admits he knew taxes were not being paid.

Sage seeks to apply the "reasonable cause" exception to include one who, after failing to pay down an existing tax liability during his tenure, tries to shift liability to a third party through a voluntary agreement. Such a broad exception would cut against the policy behind § 6672. Cf. id. at 510 (attempt to use exception "would defeat the entire purpose of the statute" where individual entered into voluntary agreement with third party that prevented his payment of taxes).[4]

Sage has explicitly admitted that he knew of the unpaid withholding taxes during the period in question and that other creditors and OTI's employees, including Sage, were paid during this period. Although summary judgment on willfulness is often inappropriate, the Court must enter judgment here as a matter of

---

[4] Moreover, in the DC Litigation, the D.C. District Court determined that Sage fraudulently induced the 1985 agreement and that the Equipment Lessors effectively rescinded it. (Ex. V at 7.) As a result, Sage is collaterally estopped from taking refuge in the agreement. See United States v. Mendoza, 464 U.S. 154, 158-59 (1984).

17

law because application of the law to the facts only supports one ultimate conclusion.

B.  Amount in Arrears

As to the amount in arrears, the Certificate of Assessment (Pl.'s Ex. A) is presumed correct, see United States v. McCombs, 30 F.3d 310, 318 (2d Cir. 1994), and "[t]o defeat a motion for summary judgment, the taxpayer must not only show that the assessment is incorrect, but it must also prove the correct amount of the tax." Chariot Plastics, Inc. v. United States, 28 F. Supp. 2d 874, 882 (S.D.N.Y. 1998); O'Callaghan v. United States, 943 F. Supp. 320, 327 (S.D.N.Y. 1996) (citing United States v. Janis, 428 U.S. 433, 440 (1976)).

According to the government's Certificate of Assessment, OTI is in arrears for $209,249.36, the unpaid balance of OTI's 1984 third quarter tax delinquency.  The original amount of the tax default from the third quarter of 1984 was $249,421.27. (Pl.'s Ex. O.)  Sage assigned some of OTI's receivables to the IRS, and the IRS levied on all of OTI's customers. (Pl.'s Ex. D at 161-62.)  Sage wrote a letter to the IRS in January 1985 requesting a release of the tax levy, acknowledging that some of the assigned receivables were being contested. (Sage Cert. Ex. G.) Nonetheless, the IRS was able to collect on certain receivables and managed to reduce the tax delinquency to $209,249.34.

Sage argues this amount is too high.  To support this

contention, he speculates about other receivables on which the government could have collected. (Sage Cert. ¶ 15 ("I do not know if the IRS received this money or even followed up . . . .")) Mere speculation is insufficient to defeat summary judgment on the amount in arrears. See O'Callaghan, 943 F. Supp. at 327 (rejecting challenge to Certificate of Assessment where taxpayer failed to provide "specific evidence" of proper amount due).

He also refers to a letter written by Sue Loop, a former OTI employee, in which she informs the IRS that it misapplied or failed to credit 1984 and 1985 payments made by OTI, totaling $93,503.82. As a threshold matter, this evidence is inadmissable as hearsay. See Fed. R. Evid. 801. Sage admits he has no personal knowledge about the letter (Sage Cert. ¶ 17), and the letter is dated one year after Sage left OTI (Sage Cert. Ex. K). The Court cannot consider evidence on a summary judgment motion that would be inadmissable at trial. See Ruben v. Mason, 387 F.3d 183, 188 (2d Cir. 2004).

Even if it were admissible, it does not prove the correct amount of the default. Sage admits he does not know whether the IRS took action on the matter addressed in the letter "since [he] was no longer privy to OTI correspondence after January 1985." (Sage Cert. ¶ 17.)

In order to overcome the Certificate of Assessment's presumption of correctness, Sage was required to show not only that the assessment was incorrect but also to prove the correct amount. Sage makes no genuine attempts to show the assessment is incorrect and makes no effort at all to articulate a correct sum.

### Conclusion

The government's summary judgment motion to reduce to judgment the $209,249.36 trust fund penalty assessed against Defendant is granted in its entirety. The action is dismissed and ordered removed from the Court's docket.

**SO ORDERED.**

**Dated:**     **New York, New York**
              **January 31, 2006**

                        */s/ John F. Keenan*
                        **JOHN F. KEENAN**
                        United States District Judge